May it please the court my name is Steve Lechner and I'd like to reserve two minutes of my time. I represent Ken McMaster, Maureen Gallitz, and Stephen Fall who are here today. My clients own the Oro Grande mining claim which was validly located in 1953. The Oro Grande was remained valid when Congress passed the Wilderness Act in 1964 and when Congress created the Trinity Alps Wilderness in 1984. Based upon the mining law, the Wilderness Act, the BLM's own regulations, similarly situated mining claimants received a full patent to the surface and minerals within their mining claims. My clients however received a patent to only the mineral deposits. Similarly situated you mean their claims were at the same point of processing? For 34 years the BLM issued full patents to claims that were valid prior to the creation of a wilderness. Well I mean and those people are not similarly situated right? Pardon me? Those are not what you call similarly situated claimants. Yeah they're similarly situated because they had a valid existing mining claim. Maybe if their claims were made well before the Wilderness Act. So are my clients and so were all the... They perfected their claims. Well a perfected claim is a claim that has been validly located and there's a valuable mineral discovery. That is the definition of a perfected claim. Here we're on a dismiss. The facts in the complaint must be accepted as true and it's accepted as true that we had a perfected claim in 1953 because we had discovery and we had a location. Everybody who had... Do you have any authority for the proposition that the holder of a mining claim who has no patent has fee simple title to claim? Well the mining law, much like all the public land grants, contemplated that the miners would construct and improve, make and create improvements on their mining claim. Right they would have possessory rights as against other people, not as against the government. But when the patent issues, they receive ownership, fee simple ownership in the structures on their mining claims. When the patent issues? When the patent issues. I mean that's the same way under the Homestead Act. The settlers went out there and cultivated land for five years. They built their houses. They got a patent. They got the houses. Those things were transferred as appurtenances. My clients had a full exclusive possessory interest in the surface. The structures were created as incident to mining. They are qualified as improvements. Under the mining law you have to do $100 worth of improvements every year. Those structures qualify as improvements. Therefore, they should have been transferred along with the patent. You said they had full, I think you used the phrase, full possessory interest in the surface. Exclusive possessory interest in the surface. That interest comes from where? From the 1872 mining law. Which says if you have a mining claim you get full? Exclusive surface. Surface rights? Yeah, 30 U.S.C. 26. When you say possessory interest, does that give them the right to construct buildings that are related to their mining activities or is that the right to sell it off to a vintner or to a ski resort? If you have full possessory interest in the surface, is that the same thing as fee title so that you could actually sell the surface rights to a ski resort? No. You couldn't sell the surface rights to the ski resort. Does the possessory rights that they have then give them the right only to construct things that are relevant to their mining activities or to do other things as well? Correct, until patent is issued. So after my clients received their limited patent, they sought judicial review and the district court dismissed their claims under Rule 26b-6 for failure to state a claim. In so doing, the district court made three fundamental errors. My clients clearly stated a plausible claim for my clients also properly stated a claim against Solicitor Leshy's opinion, which but for my clients would have received a patent. That opinion was issued in 1998. From 1964 to 1998, BLM had a consistent policy of issuing a full patent for claims that predated, valid claims that predated the creation of wilderness. That was a claim under the APA? That was a claim under Leshy's opinion? That was a stand-alone APA claim. We had argued the Leshy opinion in our first amendment complaint. We were dismissed. We filed an amended complaint. We had a stand-alone APA claim against Leshy's opinion because we're allowed to challenge, under    Now, if you look at the APA claim, it's based on Leshy's opinions when you're directly affected, and it's based on the statements in the complaint. But for that opinion, we would have gotten a full patent. Therefore, the judge erred in dismissing that at the motion to dismiss stage because we clearly stated an APA claim, and the government has backed off. So you just said, which I think is correct, but for that Leshy opinion, you would have gotten a patent, right? Full patent. Full patent. So that means you're really challenging, you know, a title to the land, which is a quiet title claim, is it? I mean, it's like, you know, asserting a backdoor quiet title claim. I know, couldn't you fully challenge the Leshy opinion in the quiet title action? We tried. We made those arguments in our first complaint. The government came in and said, well, you can't bring an APA claim because it's like a quiet title. So the judge dismissed that. Now the government has backed off that position, says it doesn't really matter what you bring them under if it's the APA or the quiet title. You got claims. So the government's position below created a whole lot of confusion for the district court, for us. But isn't your challenge to the Leshy opinion not to the opinion itself, but to what BLM did with the opinion? Obviously, BLM has been fighting with the they've now acquiesced in it. This is internal to the Department of Interior, and the Leshy opinion represents the Interior's position. So the patent, when a patent finally did issue, the limited patent that you received without the surface rights, it was in, it was consistent with the Leshy opinion. Yes. So you can challenge the action of the agency, but how can you challenge the opinion itself? Well, under the APA, Benefice Bureau, they challenged biological opinion. Other cases have challenged legal opinions upon which people were reversely affected. But the thing with the Leshy opinion, it ain't the final statement of the BLM, because the BLM has a regulation that's on the books that they promulgated in 1966 that said only people who establish a valid claim after the Wilderness Act get a limited patent. That regulation is that those who had valid claims before the Wilderness Act got a full patent. That regulation is still on the books. That regulation is the law of the land, not the Leshy opinion. The government says, well, it's ambiguous. It's not. Under Expresso Unis, that claims established under the Wilderness Act which receive a limited patent implies that pre-existing valid claims would get a full patent. And this is how the BLM interpreted it for 34 years, consistently. In fact, the BLM issued a full patent to the Horns, whose valid mining claim predated the same wilderness area, and they got a full patent in 1988. And their patents reproduced in Expresso Record 2324. Can an agency change its mind? Yes, if they go through notice and comment rulemaking under the APA. But as long as the regulation is on the books, that is binding. Under Supreme Court precedent, U.S. v. Nixon, 418 U.S. 683, 1974. Attorney General's regulation is on the books. Attorney General had to follow the regulation. Same situation here. You can't backdoor amend the regulations through a solicitor's opinion because he wasn't subject to notice and comment. And until they, I mean, Solicitor Leshee even asked them, the BLM, to amend its regulation, which is backwards, but they still haven't. It's still on the books today. It was on the books when the patent was issued. It was on the books since 1966. It's a similar language. Forest Service has similar regulations too. Therefore, under that regulation, we should have gotten a full patent. The bottom line is, we clearly stated a claim for relief, a plausible claim for title, full patent, just based on their past practices and the BLM's regulation. The problem here is the district court got confused and conflated vested rights with valid existing rights. The Savings Clause in the Wilderness Act says, hereafter, subject to valid existing rights. And at the time of the Wilderness Act, in 1964, it was well established by Supreme Court precedent that the term valid existing rights is much broader than vested rights. For example, in Eureka Mining Company, Justice Holmes recognized that the inchoate patent rights under the 1866 Load Act were preserved by the Savings Clause in the 1872 Mining Law. It's very similar. It's almost directly on point to this case. And then in Stockley v. United States, Justice Kennedy said, valid existing rights are broader than vested rights. And it makes common sense, because vested rights wouldn't need any protection. They're protected by the Fifth Amendment taking clause. So why would they put the – Congress put the Savings Clause in there simply to protect vested rights? And this goes in accordance with the legislative history, because the Savings Clause is not necessarily true, counsel. The Takings Clause doesn't prevent the government from doing actions. It doesn't prevent – it's not a substantive constraint on what the government can do under, for example, the Commerce Clause. It simply says if the government behaves in a particular way, then it's going to have to pay just compensation. Well, that's what I meant by protected. Well, those are not – those are not the same thing. But in any event, Assistant Secretary Carver put the Savings Clause, or recommended the inclusion of the Savings Clause, because he recognized under the mining law, and as it was interpreted back in 1964, that the owner of a valid mining claim perfected under the laws, like our claim, perfected by discovery and location prior to the date of the wilderness, already acquired possessory title of the surface. And he thought it would be fundamentally unfair to deny those claimants something they had already worked for and acquired. And Congress, the committee, in the committee report, recognized that. And so they said locators of claims staked after the effective date of the Wilderness Act would obtain title to only the mineral deposits. And they didn't say anything about cutting off the right to patent for preexisting valid claims like my client's. And I'd like to reserve the remainder of my time. Of course. Thank you, Mr. Lechner. Ms. Barton? May it please the Court. We believe this case can be decided on a Chevron 1 step, that Congress's intent is clear. And that was how the solicitor really approached his analysis, was whether BLM could actually legally do what it was doing. And we think Is there still a BLM regulation that's contrary to the Lechy opinion? No, the regulation is not contrary. The regulation says patents issued for issued prospectively have to include the limitations in the Wilderness Act. But it doesn't say what happens previously. And there was no regulation before. Was that regulation changed? Is that regulation new since the Lechy opinion? No. That regulation was at the time and has stayed on the books. It's pretty clear that BLM had a contrary interpretation, unless he was making a change in the way that Interior was going to behave. It's true that BLM had a contrary interpretation, but it was at the agency level. The secretary That's still a significant level. That's one that we're required to give deference to. So whether it's BLM or whether it's the solicitor, the BLM's position would have been the position of the Secretary of Interior unless there was some contrary indication. This is an internal fight to Interior. Right. If this Court thinks that this is a Chevron 2, then I I'm having a hard time figuring out how it can be a Chevron 1 issue when there was a disagreement between BLM and the solicitor. Well, because BLM never, the only thing that there is anywhere that says that BLM made a determination about this is the Carver letter. There's no, there's Wait a minute. Isn't there something in the BLM manual? Well, right. But I mean a rationale, right? There's no, there's no rationale. BLM just kept doing what it was doing before. Okay. But whether there was a rationale or there was a good explanation or not, it's still clear that there was a disagreement within the Department of Interior as to how to interpret this law. That makes it, to me, that makes it a very poor candidate for a Chevron 1 argument. Well, I disagree because I think that Carver was basing his, BLM based their analysis on Carver, and Carver based his on a misapprehension that just compensation would be required if you didn't allow valid claims that were existing at the time of the Wilderness Act to go to patent. That's the only hook that there is to read the Wilderness Act the way that BLM did. Let me ask a related question. Assume, you know, Judge Bybee, the concern reflects the panel's thinking that, well, this is not a good candidate for Step 1 deference. What happens at Chevron Step 2? What's your position as to what should happen at the Chevron Step 2 in that hypothetical situation? Right. In Chevron Step 2, then, there was a gap left for the agency to fill. Interior is the agency that handles patenting and that issues regulations and that issues the patents. The solicitor's opinion is guiding. It's signed by the secretary. It establishes precedent for the department, and it's thoroughly analyzed. It should get deference under Chevron Step 2. So then — Well, some kind of deference. You think it's Chevron — Yes. Full Chevron deference? Yes. Full Chevron. I mean, it's binding on the IBLA. This Court gives deference to IBLA decisions, and this is called an M opinion in the solicitor's office. It's a major binding-on-the-department opinion that can only be changed by going through the same process. There's — and that is exactly the kind of decision that gets Chevron deference, and it was applied here in determining a property right, adjudicating effectively a property right. So we do think it should get Chevron Step 2. I do want to note as to Step 1 that really that it — valid existing rights, the term in the statute, could only mean really one of two things, that there was a valid claim or that the right to a patent had accrued with the application for a patent. And Congress did not use the word valid claim, right? And it used it later in that very same provision in the savings clause for future — for future patents after the 20-year period ended in which new claims could be located. So that indicates that valid existing rights, that term, was doing different work. This is the solicitor's analysis, and I think it's absolutely right. And that different work it was doing is the work based on John Carver's letter, which was to avoid having to pay just compensation. And that's consistent with the purpose of the Wilderness Act. Does the Lessee opinion deal with the Carver matter? Yes. Does it deal with that form of legislative history? Yes, it does. But where does it do that? Basically, I mean, everything in our brief is laid out in the — in the opinion. Okay. It's page 10 of the — pages 9 and 10 of the Lessee opinion. Yes. And I think, I mean, basically — I mean, he suggests — it is this kind of odd language that Carver used, but it's true that it looked — Interior — Interior was not the government's last word on takings matters. The Justice Department is, of course. And Interior had a view of looking at valid existing rights from the Secretary's point of view, because obviously the Secretary wouldn't have any discretion to deny a patent that had — from a valid claim, as long as it had met all the requirements. But the Congress certainly could cut off that right. And I think — and Carver just got it wrong. So then the other aspect is in the — not only the purpose, but also in the legislative history, it specifically says that the provision about the limited patents that — only allowing limited patents to the mineral deposits going forward is — was intended to affect maximum wilderness protection. There was never any debate on the patents in the Wilderness Act. Before the — the act read just as it did, except it had — it was — it allowed future exploration for more years. Until the Carver letter came in. Then they stuck in the subject to valid existing rights, but they left everything else the same. They clearly — Congress clearly didn't think that you needed to provide a right to patent to allow mining to go forward, because they wanted mining to continue in wilderness for 20 years, but they did not provide a right to patent. So it's completely inconsistent to think that Congress had some intent to give a right to people who already were doing what Congress wanted them to do, but it didn't give to the people that it wanted to continue to encourage to look for minerals for the country's economic benefit. So for those reasons, as laid out in more detail in the solicitor's opinion, we do think this is a Chevron step one. But if it's not, then we do think that we — the solicitor's opinion deserves deference. And I think it would just be hard to read this — the Wilderness Act and this language as compelling a — that the mineral — full mineral patent should go to valid claims when Congress used valid claims elsewhere in the statute and didn't use valid claims there. So it leaves a question about what else could it mean. On the questions about the structures, the — if the structures preexisted, there isn't — I don't think there is an allegation in the complaint that the structures were initially put there after the claim was established and with government authorization and for the purpose of — I mean, it's just — it's never clear how they — those — anybody came to actually own those structures. I mean, obviously, we have a more — a closer question if there was a patent. There still could be an issue about whether those structures had been earlier abandoned and whether they were — Well, one of them, the allegation is that it was put — it dates back to the 1890s. Right. And in that case, I think that we would — I mean, we're at failure to state a claim stage, but there could be an — they have to show that there was some right to do that, and that wasn't when there was a mining claim, and that there was a — there could be a transfer when — but there wasn't — the prior people didn't have any right to the land, right? The only right arises when you establish the mining claim. So that's why there aren't — Wait a minute. What are you saying? You're saying that there's no — let's see — there's no underlying allegation of ownership that precedes the building of that — the first 1890s structure? I don't understand. I'm saying there's no — you don't get to just build buildings on Federal land and claim to own them, so — But they said they had the mining claim, right? It was built — But that was before the mining claim. It was, but that was built on the mining claim. Let me see. Well, I — I'm sorry, I have spent so much — When was the mining claim first established? What's the evidence? I thought it was 1953. I thought it went back to 1890. Oh, okay. So it was established — I'm sorry. I spent so much time on the other part of this. In other words, the claim, I think, was maybe relocated several times, changed names. Right. I just think — It seems, according to the amended complaint, traces back, way back. But the — what's — there's two things failing. It's like, anybody ever gained ownership, an ownership interest in those — a real property ownership interest, right? They had a right to use them. Ownership interest in the underlying land, on which the structure is — That's what I mean. There's no sufficient allegation of that? Well, they — no, they couldn't, because you only get that with a fee patent. You have a possessory interest, but a possessory interest doesn't give you the right to ownership of property that you put on there. Against the government, if you, you know, then patent your mineral deposits and lose your possessory right in service. Now, that doesn't mean — there are special use permits that they may apply for, to use structures on the land. If they've got a mining — if they've got a mining claim, can't they build something above, on the surface, as long as it's related to the mining claim? Yes, they can. Okay. So — but — and that — so the 1890s building could be pursuant to that — to that general right? Yes. If the claim was established, I may have made a mistake. Yeah. The allegation is that — is that they got this under — in 1934, but that in 1934, they purchased it from somebody else. That's the — that was the Conrad Barr placer mine. But the question is whether that somebody else — how that somebody else ever had title. I don't see any allegations here as to what happened pre-1934. That's the problem. That's certainly part of the problem. What does that mean? It's not sufficient to meet the particularity requirement of the quiet title action, among other things? It is just — they have failed to state a claim to ownership by showing how they legally could have obtained ownership of those. I mean, to state a claim, you have to state your legal — show your legal basis. And they don't — they show sort of a — this getting passed along, supposedly, but they don't show how anybody — you know, how there was a legal basis to a property ownership in this. Let's see if there was anything else I thought the Court — just to — I did want to emphasize about the regulations. They — to say that — the regulations say if you have a — if you're getting a patent afterwards, then this is what it has to say. But it would be just a logical fallacy to say if A, then B means if not A, then not B, right? I mean, so that regulation just clearly is only prospective. There never has been a regulation that governed prior to the wilderness area. And you could just — I mean, it could have been that BLM wanted to leave open that and not put a regulation in there while they determined what actually was required for just compensation. I mean, I'm not saying that there's anything to — but I'm just saying that there isn't — there's — we couldn't come to court and claim to have a regulation that required a certain thing when it's only implied. It certainly was implied in BLM did — did operate that way. But it was not — there was not law — if you — this is a Chevron Step 2. The first time the agency, I think, filled the gap in a way that qualifies for Chevron Step 2 would be the lessee opinion. And so it — and it doesn't represent a flip. It represents a statement of what — of how the agency views the law should work and should always have worked. If there are no more questions. Nope. Thank you, Ms. Barton. Mr. Lechner, you have time reserved. The Quiet Title Act only requires that the complaint set forth how the plaintiff acquired the ownership interest. We clearly established that by saying it was transferred to my clients by the deed in 1991. I mean, this is not a case where we're confused about what we're arguing about. The government knows about where the structures are. And there's nothing in — It's not a matter of knowing where the structures are. I think the government's argument is that, well, but you don't trace your title back, you know, far enough to show how anybody in that chain acquired — acquired either a fee or a patent or some right to — to put that structure on — on the land. There's no allegation of that. But I don't think the Quiet Title Act requires specificity in how a predecessor acquired the property. No, you have to show that you have some right to it, though. Well, we got — we got — If you say — if you say, well, you know, Teshima gave me a deed. That doesn't give you a — you know, that's not — that's in the foreclosed — that's not a sufficient allegation, is it? Unless there's some showing that I had a right. You know, you have to — apparently, the government's position is that the Quiet — — Property Requirement requires you to — to trace your chain of title back to some point where there was a — you know, where that person alleges a right to the surface ownership or to the building of the structures. And you don't do that. You just go back to, you know, what, 1934? We go to 34 when — when my client's grandfather purchased the claim and the structures, and thereafter — There's no showing that the person from whom your client's grandfather purchased the structures had any right to build the structures. Or had any right to sell them. He purchased it from his next-door neighbor. But there's a reasonable — He had never seen the property. There's a reasonable inference that if you purchase something, you're — you're assuming their grandfather was being hoodwinked by somebody who was selling them something they didn't have any right to settle. And under Iqbal and Twombly, the court has to use common sense and reasonable inferences to establish whether a claim is — I mean, this is real property. We're pretty persnickety about title to real property. And that goes back, you know, long before we were around. That goes back, you know, a thousand years of English history. Well, I understand the importance about real property, but I think we survive the pleading requirements of the Quiet Title Act. Well, let me ask a question this way. Is there anything else you think, you know, your client can allege in terms of taking the title back beyond 1934? Do you know? No, but I — we can certainly clear up any gaps between 34 and 53, because what his grandfather, once he — after he bought it in 34, maintained it and — and relocated it. And it's under the mining law. A relocator acquires the structures from his predecessors. Therefore, his grandfather can close the gap between 34 and 53, and there's no question from the gap from 53 to 91 when my client's got it by deed. Therefore, we ask that the court reverse the judgment of the district court and remand. Thank you. Thank you, and we thank both counsel for the argument. With that, we have completed the calendar for the week, and the court is adjourned.
judges: Wood, Tashima, Bybee